IN RE MANUEL R.
(13332)

PETERS, C. J., HEALEY, SHEA, CALLAHAN and GLASS, Js.

Argued April 13—decision released June 14, 1988

*George R. Oleyer,* assistant public defender, for the appellant (respondent).

*Thomas M. O'Brien,* state's advocate, with whom, on the brief, was *Andrew Chulick,* special advocate, for the appellee (state).

PETERS, C. J. The right to legal representation is guaranteed by statute to any child[1] charged with delinquency. The question in this case is whether, and under what circumstances, that right to counsel can be waived by the child. The respondent, Manuel R., appeals from the disposition of the Superior Court committing him to the department of children and youth services (DCYS) for placement at Long Lane School. We find error and remand for a new dispositional hearing.

I

The record discloses the following chronology of events: On January 5, 1987, Manuel was placed on probation by the Superior Court for a period of one year

---

[1] General Statutes § 46b-120 defines "child" as "any person under sixteen years of age."

on a burglary charge. The court ordered Manuel, as a condition of his probation, to attend high school and to adhere to its rules and regulations. Approximately four months later, William B. Carlos, a probation officer, filed a petition alleging that Manuel was a delinquent child because he had violated the terms of the court's probation order.[2] Specifically, the petition charged that Manuel, then fifteen years old, had skipped school and, while in attendance, had brought a radio with him in violation of school rules. An application for Manuel's detention during the delinquency proceeding was filed at the same time.

A hearing on the application for detention was held on April 22, 1987. According to the transcript of this hearing, the probation department sought to detain Manuel not on the basis of his alleged probation violations but rather because he had allegedly committed a third degree assault on his mother. The court declined to place Manuel in the only then available group home and instead continued the detention review hearing until the following week to allow a further exploration of residential placement possibilities. At this hearing, and at all subsequent detention and adjudicatory hearings, Manuel was represented by Attorney George Oleyer of the office of the public defender.

At the follow-up hearing on April 29, 1987, Manuel was remanded to detention by the trial court, *Barnett, J.*, on the understanding that he could be transferred to a local residential facility if an opening became available. At the close of the hearing, Manuel's mother,

---

[2] According to the court record, this petition (Docket No. 87-04-085) was filed on April 21, 1987, and alleged that Manuel was in violation of his probation because of school-related disobedience. The record also reflects that a second petition (Docket No. 87-04-138) was filed on April 22, 1987. The latter petition alleged that Manuel had committed an assault on his mother and had violated a court order. The assault charge was nolled by the state on May 13, 1987.

Carmen R., stated that, while she had confidence in Manuel and hoped that the detention would help him, she was "not going to keep letting him pull me down 'cuz I still have a life to lead, too. And he fails to realize that I'm punished for every time he does something."

The adjudicative phase of the proceeding took place two weeks later. After a colloquy following Manuel's admission that he had violated the terms of his probation, the trial court, *Barnett, J.,* accepted the plea of admission and adjudicated Manuel a delinquent child. The alleged assault, having previously been nolled by the state, did not enter into this adjudication. The case was then continued for disposition and Manuel was released into the custody of his mother on the promise that he would abide by the terms of a "contract" with his mother that had been prepared by the probation department.

Manuel next appeared before the Superior Court, so far as the record discloses, on August 17, 1987, at proceedings that, although docketed as relating to the entry of pleas on new charges, quickly evolved into a disposition of the previously adjudicated probation violations. These are the proceedings whose validity is presently at issue in this appeal.

According to the docket sheet for juvenile matters on August 17, 1987, Manuel was scheduled to appear at 10:30 a.m. for the sole purpose of entering pleas on three new charges unrelated to this appeal.[3] Before com-

---

[3] The transcript of this hearing indicates that no formal plea was taken on any of these new charges. In fact, the record reflects that two of these charges (Docket Nos. 87-06-044 and 87-07-105) were nolled on January 11, 1988. As to the third charge (Docket No. 87-07-139), there is a lacuna in the record. On remand, the parties will need to clarify the status of this charge. According to the trial court's order of commitment, the only charges that entered into its disposition in this case were Docket Nos. 87-04-085 and 87-04-138. See footnote 2, supra.

mencing the plea hearing, the trial court, *McGrath, J.*, summoned Attorney Oleyer to the courtroom, having been told by the probation officer that Oleyer represented Manuel. Oleyer appeared on the scene within a few moments and asked the court, "Can we pass this? I haven't seen him. I didn't know [Manuel and his mother] were here." Manuel's mother objected to a continuance in the following manner: "Excuse me, but I don't want—I don't want—if I have to go without an attorney I'll go without an attorney because Mr. Oleyer's going to force this thing into where Manuel's going back home and Manuel's going to do the same thing again. I'm going to miss more time from work and I'm going to lose my job, and I'm not going for it. If I have to represent my son I'll represent him."

In order to allow for further consultation between the parties, the trial court called a five minute recess. Upon its expiration, the hearing resumed when all parties, except Oleyer, reentered the courtoom. Thereafter the following exchange took place:

"Mrs. [R]: I don't want Mr. Oleyer for my son's attorney.

"The Court: Well, we have nobody else here.

"Mrs. [R]: Well, I'll represent him myself then. He tells me—he tells us five minutes then he goes out there and he's calling everybody else into the office sitting there with him. I mean, I have to go to work 'cuz I got other kids I gotta support."

The trial court then moved ahead with the plea hearing by informing Manuel of three new charges against him: larceny in the sixth degree, harrassment and possession of illegal fireworks. Having described the charges, the court expressed its reluctance to proceed any further without representation for Manuel, to which Mrs. R. responded: "Yeah, but Mr. Oleyer—he

thinks that he's gonna come in here and sit here and have Manuel sent home again today, or whatever, and just keep sending him back and forth, back and forth.''

Before Mrs. R. could complete her objections to a continuance on the entry of the pleas, Elizabeth Gleason, the state's advocate, brought to the court's attention, for the first time, Manuel's outstanding adjudication of delinquency and asked the court to enter a disposition in accordance with the recommendation of the probation officer, ''which the state strongly supports.'' Mrs. R. then commented that if Manuel were sent home again and ''he goes and gets in trouble again then I gotta miss work again.'' The probation officer informed the court that three residential facilities had rejected Manuel and that the only option was placement at the state training school (Long Lane). In answer to the trial court's question, ''Is this for disposition today?'' the probation officer replied, ''Well, yes, I was going to ask that it go for disposition because of problems in the home.'' After again being told that Manuel had already been adjudicated delinquent for probation violations, the trial court initiated the following discussion between all present:

''The Court: Okay. You want to get rid of those other two files [the probation violations] that he has against him?

''Mrs. [R]: Yes, sir.

''The Court: All right, and you're waiving on behalf of your son the attorney that would be sitting here? That's Mr. Oleyer because he was involved in these files.

''Mrs. [R]: Yes, sir.

''Mr. Carlos [the probation officer]: Your Honor, would you like me to get another attorney?

"The Court: No. The mother has indicated that she doesn't want it—it's for disposition—a replacement. And it's recommendation by you is to place him in Mead Hall until other placement is found?

"Mr. Carlos: Oh, well, no, your Honor. My recommendation today is Long Lane. That's why I was concerned about him not being represented.

"The Court: Do you understand what that recommendation is?

"Mrs. [R]: Yes, I do.

"The Court: And you still don't want him to be represented?

"Mrs. [R]: Yes.

"Mr. Carlos: I've also explained it to the youngster, your Honor. He might have different feelings about it. But I did explain to him what I was recommending.

"Mrs. [R]: Do you want an attorney?

"The Respondent [Manuel]: No.

"The Court: You don't?

"Mrs. [R]: You sure?

"The Respondent: (Nods no.)

"The Court: You understand that the recommendation is for you to be committed to Long Lane?

"The Respondent: Yes."

The court thereafter ordered Manuel committed to the custody of the DCYS for a period of two years with placement at Long Lane. Manuel appealed from the disposition to the Appellate Court and we transferred his appeal here pursuant to Practice Book § 4023. We conclude that the record in this case fails to establish that Manuel knowingly and voluntarily waived the

assistance of counsel during the dispositional stage of his delinquency proceeding. Accordingly, we find error and remand for a new hearing.

## II

Any child in Connecticut is guaranteed the right to assistance of counsel in the defense of a delinquency petition by virtue of General Statutes § 46b-135 (a),[4] which provides that, "[a]t the commencement of any proceeding" involving his or her delinquency, a child "shall have the right to counsel" and, if necessary because of indigency, the state shall incur the cost. Under Connecticut law, a delinquency proceeding is bifurcated into adjudicatory and dispositional phases. Practice Book § 1033. The express language of § 46b-135 (a) is without limitation and therefore encompasses both phases of the proceeding. See *In re Juvenile Appeal (1983–3)*, 39 Conn. Sup. 400, 401–402, 465 A.2d 1107 (1983). This statutory right to counsel comports with governing constitutional requirements. *In re Gault*, 387 U.S. 1, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967) (establishing a due process right to counsel at the adjudicatory stage of delinquency proceedings).[5]

The sole issue in this case, then, is whether a valid waiver of the respondent's right to counsel took place

---

[4] General Statutes § 46b-135 (a) provides: "RIGHT TO COUNSEL AND CROSS-EXAMINATION. (a) At the commencement of any proceeding on behalf of a delinquent child, the parent or parents, guardian and the child shall have the right to counsel and be so informed by the judge, and that if they are unable to afford counsel that counsel will be provided for them, and such counsel and such parent or parents, guardian, or child shall have the rights of confrontation and cross-examination."

[5] Given the broad coverage of the statutory right, we need not decide whether due process also mandates the right to counsel at the dispositional phase. Cf. *State* v. *Williams*, 199 Conn. 30, 45, 505 A.2d 699 (1986) (adult defendant has a constitutional right to assistance of counsel at sentencing); *A.A.* v. *State*, 538 P.2d 1004, 1005 (Alaska 1975) (dispositional phase in juvenile proceeding is equivalent to "critical stage" of sentencing in adult proceeding).

during the dispositional hearing. The respondent makes a two-fold attack on the validity of the waiver, claiming (1) that a child's right to counsel during a delinquency proceeding is nonwaivable as a matter of law, and (2) that, even if the right to counsel is waivable, the record in this case fails to establish a knowing and voluntary relinquishment of legal representation. While we disagree with the first of these claims, we agree with the second. We conclude that, in the circumstances of this case, the child did not effectively waive his right to counsel and that his mother, given her primary concern for a speedy resolution of the case, had such a conflict of interest that she lacked authority to do so on his behalf.

### A

The respondent first urges us to adopt a per se rule declaring that children under the age of sixteen are legally incompetent to waive the assistance of counsel under any circumstance. In support of this claim, the respondent cites empirical research that suggests a definite correlation between youth and lack of comprehension of constitutional rights. See, e.g., T. Grisso, Juveniles' Waiver of Rights: Legal and Psychological Competence (1981) pp. 88–93; R. Lawrence, "The Role of Legal Counsel in Juveniles' Understanding of Their Rights," 34 Juv. & Fam. Ct. J., No. 4, 49, 52–56 (1984); A. Ferguson & A. Douglas, "A Study of Juvenile Waiver," 7 San Diego L. Rev. 39, 53–54 (1970). This research has special relevance, according to the respondent, because in Connecticut the only persons who are subject to the delinquency jurisdiction of the Superior Court are below the age of sixteen. General Statutes § 46b-120. In light of empirical findings that persons of such tender years are, as a class, prone to misunderstanding legal rights, the respondent argues that a per se rule is justified.

We are not persuaded, however, that a per se rule based on the age of the child is an appropriate response to the admittedly delicate issue of juveniles' waiver of rights. The empirical evidence to date suggests that age, by itself, is not a reliable touchstone for determining a juvenile's capacity to exercise fundamental rights. A major study concluded that "age itself is quite limited in its effectiveness as a guide for weighing decisions about juveniles' understanding." T. Grisso, supra, p. 90. It is true that, for all children below the age of fourteen, the available evidence suggests that comprehension of legal rights is elusive. Id., p. 202. With regard to children between the ages of fourteen and sixteen, however, general intelligence level, as well as socio-economic status and prior court experience, become increasingly significant factors in a child's ability to grasp and exercise legal rights. Id., p. 90. The empirical literature therefore fails definitively to identify age as a surrogate for incapacity for children below the age of sixteen. For a similar conclusion, see R. Lawrence, supra, 53.

Furthermore, a per se rule of nonwaivability might actually frustrate a principal goal of juvenile law of encouraging children to accept responsibility for their transgressions and take an active role in their rehabilitation. Juvenile law embodies goals of control and treatment that are often difficult to reconcile. On the one hand, protecting society from disruptive and dangerous children often requires that courts control and incarcerate children in prison-like institutions. On the other hand, nurturing children into productive and responsible adults requires that persistent efforts be made toward individualized treatment and rehabilitation. See generally *In re Gault,* supra, 12–30; *State ex rel. D.D.H.* v. *Dostert,* 269 S.E.2d 401, 408–409 (W. Va. 1980); S. Davis, Rights of Juveniles: The Juvenile Justice System (1987) § 1.3. Without minimizing the

significance of this inevitable tension, we are persuaded that allowing a child to make an informed and deliberate choice about legal representation, if properly supervised by the trial court, can advance both the goal of control and that of treatment.

In juvenile proceedings, counsel for the child plays an important role in ensuring the reliability of adjudications underlying disposition and in developing alternative placement plans thereafter. To mandate the presence of counsel, however, might serve to reduce the child's own sense of involvement and might enhance his perception of his own role as merely that of spectator. The difficulty of engaging children meaningfully in their own cases has been recognized as a major challenge: "Courtroom deliberations often make the delinquent highly aware of his own irrelevance and inability to affect the course of the proceeding. Many decisions are reached, for example, without consulting the youth and in ways that suggest his complete incompetence to determine his own future." R. Emerson, Judging Delinquents: Context and Process in Juvenile Court (1969) p. 178; see also B. Flicker, Standards for Juvenile Justice: A Summary and Analysis (2d Ed. 1982) pp. 41–42. For those concerned with intervening successfully in the lives of troubled young persons, there is an increasing awareness that the procedures followed by the court can have a lasting impact on the child's development. See, e.g., D. Bliss, The Effects of the Juvenile Justice System on Self-Concept (1977) pp. 3–24; E. Eldefonso & A. Coffey, Process and Impact of the Juvenile Justice System (1976) pp. 74–107; C. Jones, "Problem Formulation in Juvenile Court Interventions with Unruly Children and Their Families," 36 Juv. & Fam. Ct. J., No. 1, 37, 44 (1986); A. Mahoney, "PINS and Parents" pp. 167–68, in Beyond Control: Status Offenders in the Juvenile Court (L. Teitelbaum & A. Gough, eds., 1977). In light of these principles, we

believe that the waiver of counsel decision, *in itself,* can be a significant rehabilitative moment for the child. We accordingly reject the respondent's invitation to impose a per se rule of incompetency on all children.[6]

## B

We now turn to the central question of this appeal: what standards are to guide the trial court in its determination of whether to find that a child has validly waived his or her right to counsel. As the present proceedings poignantly demonstrate, those standards must take into account the possibility of a conflict of interest when a parent or guardian advocates a waiver on behalf of the child.

We begin our analysis with a reiteration of the standards for the waiver of counsel by adult defendants. A valid waiver is defined, in accordance with the well known test of *Johnson* v. *Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938), as the intentional relinquishment or abandonment of a known right or privilege.[7] The United States Supreme Court has emphasized, subsequent to *Zerbst,* that a proper waiver of counsel must be intelligent and voluntary and that its basis, having been "clearly determined" by the trial

---

[6] We have held, in the related context of *Miranda* rights, that a juvenile is not per se incompetent to waive his or her right to remain silent. In *State* v. *Oliver,* 160 Conn. 85, 94, 273 A.2d 867 (1970), cert. denied, 402 U.S. 946, 91 S. Ct. 1637, 29 L. Ed. 2d 115 (1971), we rejected the claim of a twenty year old juvenile suspect that police must obtain the assent of a parent before waiver of *Miranda* rights is effective. As a matter of federal constitutional law, the interrogation of a juvenile may proceed if, on the basis of the totality of the circumstances, a valid waiver of *Miranda* rights occurs. *Fare* v. *Michael C.,* 442 U.S. 707, 724-25, 99 S. Ct. 2560, 61 L. Ed. 2d 197, reh. denied, 444 U.S. 887, 100 S. Ct. 186, 62 L. Ed. 2d 121 (1979).

[7] This familiar standard for the waiver of constitutional rights is traceable in part to common law antecedents. See, e.g., *O'Keefe* v. *St. Francis's Church,* 59 Conn. 551, 561 (1890) (noting that waiver of contract provisions possible if party "intentionally relinquished a known right . . ." but that "[e]quivocal conduct, or conduct of doubtful import, is not sufficient").

court, should appear on the record. *Faretta* v. *California,* 422 U.S. 806, 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); *Von Moltke* v. *Gillies,* 332 U.S. 708, 727, 68 S. Ct. 316, 92 L. Ed. 309 (1948); *Adams* v. *United States ex rel. McCann,* 317 U.S. 269, 279, 63 S. Ct. 236, 87 L. Ed. 268 (1942).

In like fashion, Practice Book § 961[8] mandates a "thorough inquiry" into specific factors about which the court must be "satisfied" before the accused "shall be permitted" to forego counsel. In particular, § 961 establishes four criteria for an effective waiver: (1) clear advisement of the right to counsel; (2) possession of sufficient intelligence and capacity to appreciate the consequences of self-representation; (3) comprehension of the charges and proceeding, the permissible punishment exposure and any additional facts essential to a broad understanding of the case; and (4) awareness of the dangers and disadvantages of self-representation. See *State* v. *Gethers,* 193 Conn. 526, 532–34, 480 A.2d 435 (1984).

We conclude that these constitutional and procedural guidelines apply with equal, if not greater, force in the context of a delinquency proceeding. It is now commonly recognized that courts should take "special care"

---

[8] "[Practice Book] Sec. 961. ——WAIVER

"A defendant shall be permitted to waive his right to counsel and shall be permitted to represent himself at any stage of the proceedings, either prior to or following the appointment of counsel. A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant:

"(1) Has been clearly advised of his right to the assistance of counsel, including his right to the assignment of counsel when he is so entitled;

"(2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent himself;

"(3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and

"(4) Has been made aware of the dangers and disadvantages of self-representation."

in scrutinizing a purported confession or waiver by a child. *Haley* v. *Ohio,* 332 U.S. 596, 599, 68 S. Ct. 302, 92 L. Ed. 224 (1948) (plurality opinion of Douglas, J.). As the United States Supreme Court acknowledged in *In re Gault, supra,* 45, "special problems may arise with respect to waiver of the privilege by or on behalf of children and . . . there may well be some differences in technique—but not in principle—depending upon the age of the child and the presence and competence of parents." See also *Gallegos* v. *Colorado,* 370 U.S. 49, 53–55, 82 S. Ct. 1209, 8 L. Ed. 2d 325 (1962) (mandating a "close scrutiny" of the confession of a fourteen year old murder suspect); *In re B.M.H.,* 177 Ga. App. 478, 479, 339 S.E.2d 757 (1986) (describing the "heavy burden" of establishing juvenile waiver of rights).

These judicial pronouncements embody the common sense notion that the validity of a child's waiver of counsel depends upon furnishing the child full information not only about the child's own legal rights but also about the overall nature of the proceeding against him or her. The need for broad-gauged advice is underscored by recent empirical studies demonstrating that significant numbers of children erroneously believe that lawyers are responsible for deciding issues of guilt and punishment, that defense lawyers will not advocate the interests of a juvenile who admits to the violation and that defense lawyers have a duty to report to the court any evidence of the juvenile client's culpability. T. Grisso, *supra,* pp. 119–20. Only a full colloquy between the court and the child can avoid such misperceptions and provide a solid basis for the intelligent exercise or waiver of the right to counsel. Only a full colloquy will permit the court to make an accurate determination of whether a child who professes to wish to proceed pro se, without counsel, has the developmental and cognitive ability to undertake a realistic assessment of the consequences of such an action. See generally B.

Inhelder & J. Piaget, The Growth of Logical Thinking from Childhood to Adolescence (1958) pp. 343–47; H. Ginsberg & S. Opper, Piaget's Theory of Intellectual Development (1969) pp. 202–206; see also *In re Gault,* supra, 55; *State* v. *Reed,* 174 Conn. 287, 293, 386 A.2d 243 (1978) (valid waiver requires "sufficient awareness of the relevant circumstances and likely consequences"); *G.L.D.* v. *State,* 442 So. 2d 401, 402–404 (Fla. App. 1983) (child relinquishes counsel rather than forfeit his guitar and amplifier to pay for the public defender). For all these reasons, our general policy of indulging every presumption against the waiver of fundamental rights; *State* v. *Marion,* 175 Conn. 211, 218, 397 A.2d 533 (1978); has special application in the context of juvenile waiver.

The fact that, at juvenile proceedings, a child is often accompanied by a parent or guardian does not diminish judicial responsibility for a searching inquiry into the validity of a potential waiver of the right to counsel. At a minimum, the presence of a lay parent or guardian, with no training in law, is no guarantee that a child will be fully informed or meaningfully represented. *K.E.S.* v. *State,* 134 Ga. App. 843, 847–48, 216 S.E.2d 670 (1975); *State ex rel. J.M.* v. *Taylor,* 276 S.E.2d 199, 203 (W. Va. 1981). Moreover, as judicial and scholarly authorities attest, parents may, for their own reasons, exert pressure on children to confess to alleged offenses and to waive the assistance of counsel. *United States* v. *Fowler,* 476 F.2d 1091, 1093 (7th Cir. 1973); *In re Matter of C.P.D.,* 367 A.2d 133, 134–35 (D.C. App. 1976); *Anglin* v. *State,* 259 So. 2d 752 (Fla. App. 1972); T. Grisso, supra, pp. 179–80.

The potential for undue parental influence is greatly increased in the event of a specific conflict of interest between parent and child. See generally B. Flicker, supra, pp. 39–40. Such a potential conflict may arise, for example, when the parent bears fiscal responsibil-

ity for the cost of retained counsel; *In re Ricky H.,* 2 Cal. 3d 513, 525, 468 P.2d 204, 86 Cal. Rptr. 76 (1970); or acts as the complaining witness in the delinquency petition; *K.E.S.* v. *State,* supra, 848; or harbors anger and resentment about the child's misbehavior. T. Grisso, supra, p. 167. Recognizing the possibility of such conflicts of interest between parent and child, Practice Book § 1045 (2) (b) expressly provides that the court "shall appoint . . . counsel for the child, whether a request is made or not . . . if in the opinion of the court the interests of the child and his parents conflict . . . ." For similar provisions in other states, see, e.g., Ariz. Rev. Stat. Ann. § 8-225 (1974); N.D. Cent. Code § 27-20-26 (1) (1974); 42 Pa. Cons. Stat. Ann. § 6337 (Purdon 1982).[9] Similarly, once a conflict of interest becomes apparent, the court may not permit a parent to waive counsel for a child.

Applying these standards for the validity of a child's waiver of the right to counsel to the facts of this case, we conclude that the record fails to establish that Manuel knowingly and voluntarily waived his right to legal representation at his dispositional hearing. The record manifests minimal participation by Manuel himself and substantial deference to the conflicting interests of his mother in immediate disposition of the charges against her son. Our statute and § 961 of our rules of practice require more of the court.

The first of the four inquiries that a court must make, under § 961, before it accepts a waiver of the right to

---

[9] Analogous conflicts of interest can arise in other areas of the law. In contested child custody cases, the appointment of counsel for minor children is the preferred method of safeguarding their independent interests. General Statutes § 46b-54; *Nye* v. *Marcus,* 198 Conn. 138, 146, 502 A.2d 869 (1985); *Yontef* v. *Yontef,* 185 Conn. 275, 284, 440 A.2d 899 (1981). Similarly, the risk of conflict when a criminal defense lawyer undertakes the representation of codefendants simultaneously requires trial judges to make a "careful inquiry" before approving of such an arrangement. *State* v. *Marion,* 175 Conn. 211, 218 n.5, 397 A.2d 533 (1978).

counsel, is whether the defendant, in this case the child, has been advised of his right to counsel. Concededly, that advice was given to the respondent in this case.

The second inquiry that § 961 requires concerns the child's intelligence and capacity to appreciate the consequence of the decision to represent himself. On this question, the trial court record is sparse at best. The court made no effort to address the respondent directly to determine whether he possessed the qualities described by the rule. In fact, the transcript reveals that Manuel uttered only five words throughout the hearing: the answer "Yes" or "No" on five separate occasions. Of these five monosyllabic answers, two were in response to the questions whether he understood his right to counsel and his right to remain silent and three were in response to the following questions from the bench: (1) "Do you want an attorney?"; (2) "You don't?"; and (3) "You understand you are going up to Long Lane for a period of time?"

To compensate for the lack of direct inquiry into the respondent's intellectual capacity to represent himself, the state argues that an eight page predispositional report prepared by the probation officer adequately apprised the trial court of the respondent's capacity to proceed pro se. We are not persuaded. The record does not show whether the trial court had the opportunity to read the report. Indeed, the fact that the proceeding began as a plea hearing, but was transformed in midstream into a dispositional hearing upon the joint suggestion of the probation officer and the state advocate, makes it doubtful that the court would have fully considered this detailed report before it made its disposition. We note in addition that the trial court, *McGrath, J.*, did not preside over the detention and adjudicatory phases of this case and therefore had no prior opportunity on this record to observe the respondent and form a judgment about his mental capacity.

Finally, even if the trial court did evaluate the report, the record contains no indication that its contents were determinative.[10] Accordingly, the record falls short of "*affirmatively* show[ing] that [the repondent] was literate, competent and understanding, and that he voluntarily exercised his informed free will." (Emphasis added.) *Faretta* v. *California,* supra, 835; *Consiglio* v. *Warden,* 153 Conn. 673, 678, 220 A.2d 269 (1966).

The third requirement of § 961 is that the court satisfy itself that the child comprehends the "charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case." The record in this regard raises the contrary inference, that the respondent did *not* understand the proceeding or the range of potential dispositions. According to the probation officer, when told that Long Lane was the proposed disposition, the respondent said he had "different feelings about it." Only moments later, however, the respondent purported to waive the presence of the one person whose responsibility it was to augment and investigate the state's recommendation. This curious juxtaposition suggests an incomplete understanding of the possibility that there might be dispositional alternatives other than those recommended by the probation officer.

Finally, it is apparent that the respondent was not "made aware of the dangers and disadvantages of self-representation" as required by the fourth element of § 961. Counsel can perform a variety of useful functions during the dispositional phase of a delinquency proceeding. In particular, the child might be informed that a primary obligation of defense counsel is to augment and investigate the placement recommendation

---

[10] As a matter of fact, the psychologist's report in the predispositional study concludes that "[t]he patient is an impulse-dominated fifteen-and-a-half year old youth who is functioning *well below* his intellectual potential." (Emphasis added.)

of the state so that the ultimate disposition is tailored to the child's individual needs. *State ex rel. D.D.H.* v. *Dostert,* supra, 412–13; IJA/ABA, Juvenile Justice Standards Project, Standards Relating to Counsel for Private Parties §§ 9.1 through 9.5 (1980). Additionally, counsel can exercise the rights of confrontation and cross-examination; General Statutes § 46b-135 (a); subpoena witnesses, ensure adherence to procedural regularity and assist the child and the family in securing important state services. On the record before us, there was no effort whatsoever to inform the respondent and his mother of the risks of self-representation.

In its totality, this record manifests a canvass that fails to comport with well established rules concerning waiver of the right to counsel. Without a compliance with Practice Book § 961, and in the absence of other evidence sufficient to establish the respondent's knowing and voluntary waiver of his statutory right to counsel, it was error to order his commitment to the department of children and youth services with placement at the state training school.

There is error, the judgment is set aside and the case is remanded to the trial court for a new dispositional hearing.

In this opinion the other justices concurred.