STATE OF CONNECTICUT *v.* PAUL PEREZ
(13944)

SHEA, GLASS, COVELLO, HULL and BORDEN, Js.

Argued February 22—decision released May 14, 1991

*Carol R. Goldberg,* assistant public defender, with whom was *Kent Drager,* assistant public defender, for the appellant (defendant).

*Donald A. Browne,* state's attorney, with whom, on the brief, was *Linda Howe,* assistant state's attorney, for the appellee (state).

BORDEN, J. The principal issue of this appeal is whether a fourteen year old juvenile who has been arrested for murder, and whose case therefore must be transferred from the juvenile docket to the regular criminal docket pursuant to General Statutes (Rev. to 1987) § 46b-127 (1),[1] may validly waive his *Miranda*[2]

---

[1] General Statutes (Rev. to 1987) § 46b-127 (1) provides: "The court shall transfer to the regular criminal docket of the superior court from the docket for juvenile matters: (1) Any child referred for the commission of a murder under sections 53a-54a to 53a-54d, inclusive, provided any such murder was committed after such child attained the age of fourteen years."

We note that § 46b-127 was amended effective July 1, 1991. This amendment is irrelevant for the purposes of the appeal before us, and our references to § 46b-127 throughout this opinion relate to the 1987 revision.

[2] See *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

rights without a specific warning of the possibility of such a transfer. The defendant appeals from the judgment of conviction of murder in violation of General Statutes § 53a-54a (a),[3] rendered upon his conditional plea of nolo contendere pursuant to General Statutes § 54-94a,[4] following the denial by the trial court of his motion to suppress his confession.

The defendant claims that the trial court should have suppressed his confession because: (1) it was impossible for him to make an intelligent, knowing and voluntary waiver of his *Miranda* rights absent a specific warning that he would be exposed to more than juvenile treatment of the charges against him; and (2) under the totality of the circumstances, his waiver was not knowing and intelligent. We affirm.

---

[3] General Statutes § 53a-54a (a) provides: "MURDER. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in his subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[4] General Statutes § 54-94a provides: "CONDITIONAL NOLO CONTENDERE PLEA. APPEAL OF DENIAL OF MOTION TO SUPPRESS OR DISMISS. When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress evidence based on an unreasonable search or seizure, motion to suppress statements and evidence based on the involuntariness of a statement or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution."

On May 30, 1988, the defendant, who was then four-teen years of age, was arrested by the Bridgeport police department for a murder that had occurred on May 27, 1988, in Father Panik Village. Thereafter, the state filed a delinquency petition against the defendant in the Superior Court for juvenile matters based upon an allegation of intentional murder in violation of General Statutes § 53a-54a. The case was transferred to the regular criminal docket pursuant to General Statutes § 46b-127. After the court found probable cause pursuant to General Statutes § 54-46a,[5] the defendant moved to suppress a written confession that he had

[5] General Statutes Sec. 54-46a provides: "PROBABLE CAUSE HEARING FOR PERSONS CHARGED WITH CRIMES PUNISHABLE BY DEATH OR LIFE IMPRISONMENT. (a) No person charged by the state, who has not been indicted by a grand jury prior to May 26, 1983, shall be put to plea or held to trial for any crime punishable by death or life imprisonment unless the court at a preliminary hearing determines there is probable cause to believe that the offense charged has been committed and that the accused person has committed it. The accused person may knowingly and voluntarily waive such preliminary hearing to determine probable cause.

"(b) Unless waived by the accused person or extended by the court for good cause shown, such preliminary hearing shall be conducted within sixty days of the filing of the complaint or information in superior court. The court shall be confined to the rules of evidence, except that written reports of expert witnesses shall be admissible in evidence and matters involving chain of custody shall be exempt from such rules. No motion to suppress or for discovery shall be allowed in connection with such hearing. The accused person shall have the right to counsel and may attend and, either individually or by counsel, participate in such hearing, present argument to the court, cross-examine witnesses against him and obtain a transcript of the proceedings at his own expense. At the close of the prosecution's case, if the court finds that, based on the evidence presented by the prosecution, probable cause exists, the accused person may make a specific offer of proof, including the names of witnesses who would testify or produce the evidence offered. The court shall not allow the accused person to present such evidence unless the court determines that such evidence would be sufficient to rebut the finding of probable cause.

"(c) If, from the evidence presented pursuant to subsection (b) of this section, it appears to the court that there is probable cause to believe that the accused person has committed the offense charged, the court shall so find and approve the continuance of the accused person's prosecution for

given on the evening of his arrest. Following an evidentiary hearing, the trial court denied the motion. The defendant thereafter entered a conditional plea of nolo contendere. The court accepted the plea, and sentenced the defendant to twenty-five years imprisonment. The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b).[6]

The state's evidence at the hearing on the motion to suppress was as follows.[7] On May 30, 1988, at approximately 2 p.m., the Bridgeport police arrested the fourteen year old defendant for the crime of murder in connection with a shooting death in Father Panik Village on May 27, 1988. Uniformed police officers took the defendant to the detective bureau of the police department. The detective bureau is in the main office of the police department, and the youth bureau, where juvenile cases are ordinarily processed, is in a different location. The defendant was calm, passive and quiet at the time of the arrest and while he was being transported to the police station.

At the detective bureau, Detective Robert Kwett, who was in charge of the investigation, told the defendant that he was under arrest for murder and that they could not discuss the matter without the presence of his mother, Jeanette Perez. The police eventually located Jeanette Perez in New London, where she was

that offense. A determination by the court that there is not probable cause to require the accused person to be put to trial for the offense charged shall not operate to prevent a subsequent prosecution of such accused person for the same offense."

[6] General Statutes § 51-199 (b) provides in pertinent part: "The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[7] Although the defendant's mother testified at the hearing, the defendant did not.

visiting relatives, and awaited her arrival at the police station. While they waited, the defendant was detained without questioning in an interrogation room, was supplied with food and water, and was permitted to use the bathroom. Kwett entered the interrogation room several times to make sure that the defendant was all right.

Jeanette Perez arrived at the police station at approximately 8 p.m. and spoke to Detective Michael Kozlowsky, who informed her that her presence was necessary while the defendant was advised of his rights and questioned about the shooting. Jeanette Perez spoke English very well.

After leaving Jeanette Perez and the defendant alone in the interrogation room for approximately ten minutes, Kozlowsky entered the room and began the interrogation by determining from the defendant and Jeanette Perez that they each could read and write English. Kozlowsky had the defendant read aloud the first two lines of a "rights form" document and Kozlowsky read aloud a copy of the form to them while they read the form. While Jeanette Perez looked on, the defendant filled in the identifying and background information at the top of the form by writing the date, his name, his age and birth date, the name of the last school he had attended, the last grade he had completed, and writing "yes" to the questions, "Can you read?" and "Can you write?"

Kozlowsky asked the defendant and Jeanette Perez to read each of the individual rights while he read the rights aloud to them. He asked them if they understood them, and told them that if they did so, to initial the form. The defendant initialed each of the five printed warnings of rights,[8] and at 8:35 p.m. he signed and

_____

[8] The form stated that the defendant had been advised and knew that (1) he had a right to remain silent; (2) anything he said could be used against

dated the form directly underneath the waiver of these rights.[9] Jeanette Perez and Kozlowsky signed the form as witnesses to his signature.

Kozlowsky then questioned the defendant in the presence of Jeanette Perez, and the defendant's confession to the shooting was reduced to a four page typewritten statement in question and answer form. In the statement, the defendant acknowledged that it was taken in the presence of Jeanette Perez, that he could read and write English, and that he had completed the fifth grade in school. He also acknowledged that he had been advised of his rights, both orally and in writing, that he understood them, that there had been no threats, promises or rewards, and that he gave the statement of his own free will. The statement indicated that it began at 9 p.m. and ended at 10 p.m.

Before the defendant signed the statement, Kozlowsky asked Kwett to review the statement in order to determine whether he "had covered all the bases." While Kozlowsky was out of the room, Kwett told the defendant and Jeanette Perez that if someone had put him up to the shooting, or if there were other extenuating circumstances, he should tell the police. Kwett also told them that the case would not remain in the juvenile system but would be "referred to the adult court system." He told the defendant to discuss

him in a court of law; (3) he had a right to an attorney, and that the attorney could be with him while he was being questioned by the police; (4) if he could not afford an attorney, one would be appointed for him and he could have the attorney with him before answering any questions; and (5) he could refuse to answer questions, or could stop answering questions at any time if he so desired.

[9] The waiver stated: "Now that I have been advised of my rights and that I fully understand these rights, I am willing to be interviewed and answer questions. I *do not* wish the presence of an attorney at this time. I am waiving these rights freely and voluntarily, without any fear, threat, or promises being made to me." (Emphasis in original.)

with his mother whether anyone else was responsible for his participation in the shooting, and left the two of them alone in the room for that purpose. When Kwett returned to the room, the defendant told him that he had nothing to add to the statement.

Kozlowsky returned to the room and told the defendant to read the statement and to sign each page if he agreed to what had been typed thereon. The defendant read the statement, signed the margins of the first three pages, and signed at the end of the fourth page. Jeanette Perez and Kozlowsky signed as witnesses to his signature, and another police officer took the defendant's oath to the statement.

Throughout the entire procedure the defendant was calm and collected. At no time did he indicate that he wanted the questioning to stop or that he wanted an attorney. There were no threats or promises made to him.

There was also testimony at the hearing on the motion to suppress from James Fulton, who had been the defendant's juvenile probation officer since 1985, when the defendant's extensive involvement with the juvenile authorities began. On several prior occasions, Fulton had advised the defendant, in the presence of Jeanette Perez, of his right to remain silent, of the fact that anything he said could be used in court, and of his right to an attorney and to have an attorney appointed if he could not afford one. Further, he also had been with Jeanette Perez and the defendant when the defendant had been similarly advised by a judge in the juvenile courtroom. The defendant and Jeanette Perez had understood those rights on those occasions. Although the defendant had never before had a case referred from the juvenile court to the regular criminal docket, he had been committed to the custody of

the commissioner of children and youth services with a placement at Long Lane School. Fulton had advised the defendant on several occasions that if he continued to engage in serious delinquent conduct he would end up in the adult court with "more serious consequences."

The trial court specifically found that Fulton had previously advised the defendant that, "because of his continued . . . course of conduct, he could end up in adult court." The court also found that he had been fully advised of his *Miranda* rights, and that his waiver of those rights had been intelligent, knowing and voluntary. Accordingly, the court denied the motion to suppress. This appeal followed.

## I

The defendant's principal claim is that, under the self-incrimination clauses of the fifth amendment to the United States constitution[10] and article first, § 8, of the Connecticut constitution,[11] "it was not possible for him to make an intelligent, knowing and voluntary waiver of his [*Miranda*] rights because he was not adequately informed of the potential consequences of such waiver." Those potential consequences were that, notwithstanding his age, the murder to which he confessed would be prosecuted on the regular criminal docket, rather than in the juvenile part of the Superior Court, and that he would thereby be exposed to criminal, rather than juvenile, sanctions. The defendant argues that, notwithstanding the totality of the circumstances surrounding his waiver, his confession was rendered inadmissible by the absence of any such warnings by the police. We disagree.

[10] The fifth amendment to the constitution of the United States provides in pertinent part that no person "shall be compelled in any criminal case to be a witness against himself . . . ."

[11] The constitution of Connecticut, article first, § 8, provides in pertinent part: "No person shall be compelled to give evidence against himself . . . ."

We first consider the constitutional basis for the defendant's claim. Although he purports to rely on both the federal and the state constitutions, his brief is bereft of any analysis of article first, § 8, of the Connecticut constitution. We consistently have declined to consider criminal state constitutional claims in the absence of an independent analysis of the particular state constitutional provision at issue; see *State* v. *Mooney,* 218 Conn. 85, 89 n.5, 588 A.2d 145 (1991); *State* v. *Couture,* 194 Conn. 530, 572A–B n.2, 482 A.2d 300 (1984), cert. denied, 496 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985); and we decline to depart from that wise policy in this case.

Instead of furnishing such an analysis, the defendant relies primarily on the decision of the New Hampshire Supreme Court in *State* v. *Benoit,* 126 N.H. 6, 490 A.2d 295 (1985), where the court stated that "when a confession is to be admitted against a child in adult *criminal* court, we are persuaded that for a judge to conclude that the statements were made knowingly and intelligently, the child, when facing a charge that would be a felony if committed by an adult, must have been advised of the possibility of his being tried as an adult and of his being subject to adult criminal sanctions." (Emphasis in original.) Id., 17. Accordingly, the court held that a juvenile's waiver of his rights against self-incrimination can only be deemed to have been voluntary, knowing and intelligent "if facing charges that would constitute a felony if committed by an adult, the juvenile [was] informed of the consequences of a certification to stand trial as a criminal [adult] defendant." Id., 19. The defendant in this case urges us to adopt the same principle. We decline to do so.

First, the explicit constitutional basis of *Benoit* was the right against self-incrimination under "part I, article 15 of the New Hampshire constitution"; id., 16; and

not the fifth amendment to the United States consti-
tution. Although we have looked to the constitutions
of other states in order to illuminate the meaning of
our own; see, e.g., *State* v. *Marsala,* 216 Conn. 150,
171–72 n.14, 579 A.2d 58 (1990); reliance on other state
constitutional precedent does not suffice as a proxy for
independent analysis of our own constitutional lan-
guage, history, tradition and policy. Absent such an
analysis in this case, we decline to adopt the *Benoit* rule
as a persuasive interpretation of article first, § 8, of
the Connecticut constitution.[12]

We turn, therefore, to the claim of the defendant that
the fifth amendment, as applied to the states through
the due process clause of the fourteenth amendment,
requires that, in order for the defendant to have volun-
tarily, knowingly and intelligently waived his right
against self-incrimination, he must have been advised
that he was subject to criminal prosecution as an adult,
rather than having his case disposed of in the juvenile
part of the court. We are unpersuaded.

The touchstone of this analysis is *Fare* v. *Michael C.,*
442 U.S. 707, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979),
where the court held that it was inconsistent with the
principles underlying *Miranda* for the California
Supreme Court to hold that a juvenile's request for his
probation officer during questioning was "a *per se* invo-
cation of Fifth Amendment rights in the same way the
request for an attorney was found in *Miranda* to be,
regardless of what the interrogation otherwise might
reveal." (Emphasis in original.) Id., 714–15. In *Fare,*

---

[12] Furthermore, the viability of *State* v. *Benoit,* 126 N.H. 6, 490 A.2d 295
(1985), as constitutional precedent even in New Hampshire is doubtful. In
*State* v. *Dandurant,* 132 N.H. 617, 567 A.2d 592 (1989), the court declined
to follow *Benoit* primarily because of a *statute* that "obviate[d] the require-
ment of such simplified [*Benoit*] warnings . . . ." *State* v. *Dandurant,*
supra, 619. If the underpinnings of *Benoit* were constitutional, it is diffi-
cult to see how a statute could obviate its rule.

the court held that California's rejection of the totality of the circumstances approach to juvenile confessions was constitutionally impermissible as a matter of federal constitutional law. Id., 717; see also *Oregon* v. *Hass,* 420 U.S. 714, 719, 95 S. Ct. 1215, 43 L. Ed. 2d 570 (1975).

The court stated: "[The] totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. . . . This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare* v. *Michael C.,* supra, 725. The court expressed its confidence that the totality of the circumstances test affords a court the "necessary flexibility" to take into account a juvenile's "limited experience . . . education and . . . immature judgment . . . ." Id. "At the same time, that approach refrains from imposing rigid restraints on police and courts in dealing with an experienced older juvenile who knowingly and intelligently waives his Fifth Amendment rights and voluntarily consents to interrogation." Id., 725–26.

Similarly, in this case a per se requirement that a juvenile be advised of the possibility of transfer of his case to the regular criminal docket would impose a rigid requirement on the police that would be inconsistent with the principles underlying *Miranda* and *Fare.* The totality of circumstances standard is capacious enough to take the necessity of such advice into account in the court's determination of whether, under all the circumstances of a given case, the defendant's waiver was voluntary. Thus, where the circumstances indicate that the defendant's waiver was impelled principally by his

belief that only juvenile, and not adult, court conse-
quences would follow, "the totality approach will allow
the court the necessary flexibility to take this into
account in making a waiver determination." Id., 725.[13]
There is neither a need nor a sound policy reason to
transform that possibility into a per se rule.

We recognize, of course, "that courts should take
'special care' in scrutinizing a purported confession or
waiver by a child. *Haley* v. *Ohio,* 332 U.S. 596, 599,
68 S. Ct. 302, 92 L. Ed. 2d 224 (1948) (plurality opin-
ion of Douglas, J.). As the United States Supreme Court
acknowledged in *In re Gault,* [387 U.S. 1, 45, 87 S. Ct.
1428, 18 L. Ed. 2d 527 (1967)], 'special problems may
arise with respect to waiver of the privilege by or on
behalf of children and . . . there may well be some
differences in technique—but not in principle—
depending upon the age of the child and the presence
and competence of parents.' See also *Gallegos* v.
*Colorado,* 370 U.S. 49, 53–55, 82 S. Ct. 1209, 8 L. Ed.
2d 325 (1962) (mandating a 'close scrutiny' of the con-
fession of a fourteen year old murder suspect); *In re
B.M.H.,* 177 Ga. App. 478, 479, 339 S.E.2d 757 (1986)
(describing the 'heavy burden' of establishing juvenile
waiver of rights)." *In re Manuel R.,* 207 Conn. 725, 738,
543 A.2d 719 (1988).[14] That special care and close scru-

---

[13] We do not imply, however, that even in such a case the court would
be required by that fact alone to hold any ensuing waiver invalid. That is
simply one of the circumstances that the court must consider.

[14] It is true that in *In re Manuel R.,* 207 Conn. 725, 543 A.2d 719 (1988),
we stated that "the validity of a child's waiver of counsel depends upon
furnishing the child with full information not only about the child's own
legal rights but also about the overall nature of the proceeding against him
or her." Id., 738. That statement, however, was made in the context of
deciding whether the juvenile in that case had made a valid waiver of counsel
at his dispositional hearing in the juvenile court. Id., 740. Its broad lan-
guage is inapplicable to the waiver of the right to counsel in a custodial
interrogation setting governed by *Miranda* v. *Arizona,* 384 U.S. 436, 86
S. Ct. 160, 16 L. Ed. 2d 694 (1966).

tiny does not translate, however, into the rigid rule proposed by the defendant in this case.

This conclusion is in accord with the overwhelming weight of the authorities that have considered this question. Those authorities have applied a totality of the circumstances test to confessions by juveniles, and have rejected the notion that such a confession is rendered involuntary solely by virtue of the fact that the police did not inform the juvenile that he could be prosecuted as an adult, rather than as a juvenile. See, e.g., *In re Appeal in Pinal County, Juvenile Action No. J-677,* 134 Ariz. 502, 503, 657 P.2d 915 (1982); *State* v. *Mattox,* 113 Ariz. 252, 254–55, 550 P.2d 630 (1976); *People* v. *Prude,* 66 Ill. 2d 470, 475–76, 363 N.E.2d 371, cert. denied, 434 U.S. 930, 98 S. Ct. 418, 54 L. Ed. 2d 291 (1977); *State* v. *O'Connor,* 346 N.W.2d 8, 10 (Iowa 1984); *Edwards* v. *State,* 227 Kan. 723, 726, 608 P.2d 1006 (1980); *State* v. *Stewart,* 197 Neb. 497, 507–509, 250 N.W.2d 849 (1977), overruled on other grounds, *State* v. *Palmer,* 224 Neb. 282, 399 N.W.2d 706 (1987); *Quiriconi* v. *State,* 96 Nev. 766, 771–72, 616 P.2d 1111 (1980); *Matter of V.W.B.,* 665 P.2d 1222, 1223–24 (Okla. 1983); *State* v. *Gullings,* 244 Or. 173, 181–82, 416 P.2d 311 (1966); *Harris* v. *Commonwealth,* 217 Va. 715, 719–20, 232 S.E.2d 751 (1977); *State* v. *Luoma,* 88 Wash. 2d 28, 36–38, 558 P.2d 756 (1977); *State* v. *Manns,* 329 S.E.2d 865, 870 (W. Va. 1985).

This conclusion is also supported by sound public policy. The factual basis of the defendant's claim is that a juvenile like him, who had extensive previous contact with the juvenile system without referral to the regular criminal docket, would be likely to expect similar treatment and, therefore, would be more likely to be misled by his prior experience into waiving his rights than if he knew that more serious consequences were to follow. This rationale would not apply, however, to

the first time juvenile offender. We doubt the wisdom of a proposed constitutional requirement designed to protect the juvenile experienced in the ways of law enforcement and the judicial system but not the juvenile inexperienced in those ways.

## II

The defendant's alternate claim is that his confession should have been suppressed because, under the totality of the circumstances, it was involuntary. We disagree.

The totality of the circumstances test applicable to the waiver by a juvenile of his *Miranda* rights involves inquiry into the " 'juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.' " *State* v. *Whitaker,* 215 Conn. 739, 754, 578 A.2d 1031 (1990), quoting *Fare* v. *Michael C.,* supra, 725. Additional sources of inquiry include experience with the police and familiarity with the warnings, ability to read and write in the language used to give the warnings, any intoxication, the juvenile's emotional state, and any mental disease, disorder or retardation. *State* v. *Whitaker,* supra. We scrupulously examine the record to determine whether the court's finding of voluntariness is supported by substantial evidence; *State* v. *Chung,* 202 Conn. 39, 48–49, 519 A.2d 1175 (1987); and whether the waiver was established by a preponderance of the evidence. *State* v. *Whitaker,* supra, 753.

Applying these principles to this case, we conclude that the court's finding of a voluntary, knowing and intelligent waiver must stand. The defendant was familiar with the police and with *Miranda* warnings, as indicated by his extensive juvenile record. At age fourteen, he was near the upper limit for treatment as a juve-

nile in this state, age fifteen. Despite his rather limited formal education, he demonstrated no difficulty with the English language, either written or spoken, and there is no suggestion in this record of any intoxication, or mental or emotional impairment of any kind. He was calm throughout the entire process. His initials and signatures on both the waiver of rights form and on the written confession are clear and legible. The police scrupulously followed proper procedure in warning him, in his mother's presence, of his rights and in obtaining his written waiver of those rights.

Furthermore, there is no evidence in this record to suggest that the defendant was in fact misled into waiving his rights by his prior contact with the juvenile system. He had been previously warned by Fulton that continued serious delinquent conduct would lead to adult criminal treatment, and the questioning in this case took place, not in the youth bureau, but in the detective bureau, thus distinguishing it from the defendant's prior juvenile experiences. Moreover, when Kwett specifically warned him before he signed the statement that this particular case would be transferred to the adult criminal docket, he nonetheless was willing to sign the statement.

The judgment is affirmed.

In this opinion the other justices concurred.